AMERICAN CIVIL LIBERTIES UNION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Tele-Communications, Inc., et al., Intervenors.

CABLE TELEVISION ACCESS COALITION, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Tele-Communications, Inc., et al., Intervenors.

NATIONAL LEAGUE OF CITIES, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Tele-Communications, Inc., et al., Intervenors.

NATIONAL FEDERATION OF LOCAL CABLE PROGRAMMERS, et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Tele-Communications, Inc., et al., Intervenors.

CITY OF NEW YORK, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Tele-Communications, Inc., et al., Intervenors.

GUAM CABLE TV, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Tele-Communications, Inc., et al., Intervenors.

COUNTY OF CONTRA COSTA, CALIFORNIA, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Tele-Communications, Inc., et al., Intervenors.

YAKIMA VALLEY CABLEVISION, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents, Board of Supervisors of Fairfax County, VA, Cities of Sunnyside and Grandview, Wash. and City of Southfield, Michigan, National Cable Television Association, Inc., Centel Corporation, Intervenors.

CONNECTICUT CABLE TELEVISION ASSOCIATION, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents, National Cable Television Association, Inc., Centel Corporation, Intervenors.

Nos. 85–1666 to 85–1671, 85–1673, 86–1432 and 86–1439.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 22, 1987.

Decided July 17, 1987.

Paul S. Ryerson and Robert T. Perry, with whom Robert Alan Garrett and Patrick J. Grant, Washington, D.C., for the City of New York, Cynthia Pols and Frederick Simpich, Washington, D.C., for National League of Cities, Michael Botein,

Washington, D.C., for ACLU, et al., Edward J. Perez, Deputy City Atty., Los Angeles, Cal., for the City of Los Angeles, Cal., Garry E. Hunter, Athens, Ohio, for the City of Athens, Ohio, Michael I. Meyerson for New York Citizens' Committee for a Responsible Media, Joseph Van Eaton, Washington, D.C., for National Federation of Local Cable Programmers, William B. Gundling, Asst. Atty. Gen., State of Conn., Hartford, Conn., for the Dept. of Public Utility Control of the State of Connecticut, and Edward P. Kearse for Nat. Ass'n of State Cable Agencies, were on the joint brief for American Civil Liberties Union, et al., petitioners in Nos. 85-1666, 85-1667, 85-1668, 85-1669, 85-1670 and 85-1673 and intervenors in No. 85-1666.

Brent N. Rushforth, with whom John I. Davis, Washington, D.C., for Connecticut Cable Television Ass'n, Inc., Stuart F. Feldstein, Washington, D.C., for Yakima Valley Cablevision, Inc., Ian D. Volner and Mark L. Pelesh, Washington, D.C., for Media General Cable of Fairfax, Inc., and Wesley R. Heppler and James F. Ireland, III, Washington, D.C., for United Cable Television Corp., et al., were on the joint brief for Connecticut Cable Television Ass'n, Inc., et al. petitioners in Nos. 86-1439 and 86-1432 and intervenors in No. 85-1666. John P. Cole, Jr. and David M. Silverman, Washington, D.C., entered appearances for intervenor, United Cable Television Corp., et al.

Robyn G. Nietert, with whom Richard L. Brown and Lauritz S. Helland, Washington, D.C., were on the brief, for Guam Cable TV, petitioner in No. 85-1671 and intervenor in No. 85-1666.

Gregory M. Christopher, Counsel, F.C.C., with whom John E. Ingle, Deputy Associate Gen. Counsel and Jane E. Mago, Counsel, F.C.C., were on the brief for respondent F.C.C. Daniel M. Armstrong, Asst. Gen. Counsel, F.C.C., John J. Powers, III, Frederic Freilicher, Marion L. Jetton and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondents, F.C.C. and U.S. in Nos. 85-1666, 85-1667, 85-1668, 85-1669,

85-1670, 85-1671, 85-1673, 86-1432 and 86-1439.

Michael S. Schooler, with whom Brenda L. Fox, Washington, D.C., and Stephen R. Effros for National Cable Television Ass'n, Inc., Theodore D. Frank, Washington, D.C., for Centel Corp., David G. Rozzelle and Kathryn Riley Dole, Washington, D.C., for Gill Industries, Inc., Stuart F. Feldstein, Washington, D.C., for Arizona Cable Television Ass'n, David J. Saylor and Steven J. Horvitz, Washington, D.C., for Harron Communications Corp., and Mark J. Prak, Raleigh, N.C., for North Carolina Cable Television Ass'n, Inc., were on the joint brief for intervenors, National Cable Television Ass'n, et al. in Nos. 85-1666, 86-1432 and 86-1439.

Gary L. Christensen, Arlington, Va., was on the brief for intervenor, pro se in No. 85-1666.

Nicholas P. Miller, W. Randolph Young and Larrine S. Holbrooke, Washington, D.C., were on the brief for intervenor, City of Dubuque, Iowa in No. 85-1666.

Richard K. Greenberg, Asst. Atty. Gen., State of Conn., Hartford, Conn., was on the brief for intervenor The State of Connecticut and its Com'r of Revenue Services in No. 85-1666.

B. Jay Baraff and James E. Meyers, Washington, D.C., entered appearances for intervenor, Tele-Communications in No. 85-1666.

Robert F. Corazzini and Peter H. Feinberg, Washington, D.C., entered appearances for intervenor, Adams-Russell Cable Services, et al. in No. 85-1666.

Paul G. Gaston and Paul J. Berman, Washington, D.C., entered appearances for intervenor, Cellular Telecommunications Div. of Telocator Network of America in 85-1666.

Paul Glist, Washington, D.C., entered an appearance for intervenor, Texas Cable in No. 85-1666.

Jack N. Goodman and Robert J. Aamoth, Washington, D.C., entered appearances for intervenor, Time, Inc. in No. 85-1666.

John F. Beasley and Vincent L. Sgrosso, Washington, D.C., entered appearances for intervenor, BellSouth Corp. in No. 85–1666.

Phillip L. Spector, Washington, D.C., entered an appearance for intervenor, Direct Satellite Communications, Inc. in No. 85–1666.

David R. Anderson and Andrea Ann Timko, Washington, D.C., entered appearances for intervenor, Post-Newsweek Cable, Inc.

James M. Smith and J. Laurent Scharff, Washington, D.C., entered appearances for intervenor, Ass'n of Independent Television Stations, Inc. in No. 85–1666.

Donna A. Demac, New York City, entered an appearance for intervenor, Office of Communications of the United Church of Christ in No. 85–1666.

Henry L. Baumann and Michael D. Berg, Washington, D.C., entered appearances for intervenor, Nat. Ass'n of Broadcasters in No. 85–1666.

Donald J. Mulvihill, Hugh P. Morrison, Jr., Kathy M. Silberthau, Rand McQuinn, Washington, D.C., David Stitt, and Michael Long, Fairfax, Va., entered appearances for intervenor, The Bd. of Supervisors of Fairfax County, Virginia in Nos. 85–1666 and 86–1432.

George Y. Wheeler, Alan Y. Naftalin and Gregory C. Staple, Washington, D.C., entered appearances for intervenor, Eagle Telecommunications in No. 85–1666.

Craig J. Gehring, John Longstreth and Henry C. Eisenberg, Washington, D.C., entered appearances for Cities of Sunnyside and Grandview, Washington, etc. in No. 85–1666 and 86–1432.

Before EDWARDS, STARR and BUCKLEY, Circuit Judges.

Opinion for the Court PER CURIAM.*

---

Separate concurring statement filed by Circuit Judge EDWARDS.

Opinion dissenting in part filed by Circuit Judge STARR.

PER CURIAM:

In these consolidated cases, we review orders of the Federal Communications Commission ("FCC" or the "Commission") implementing the Cable Communications Policy Act of 1984 (the "Cable Act" or the "Act"), Pub.L. No. 98–549, 98 Stat. 2779 (codified in scattered sections of 47 U.S.C.). The orders under review embody a number of "legislative" and "interpretive" rules that have been challenged by an assortment of discontented parties. The central issues raised by these petitions for review, however, are two. The first is whether the FCC properly identified the circumstances and conditions under which local communities (or "franchising authorities") may regulate the rates charged by cable operators for cable services. The second is whether the FCC may, under certain circumstances, decline to resolve disputes over whether particular "taxes" or "assessments" imposed on cable companies by franchising authorities violate the federal standards established by Congress for "franchise fees."

Based on our careful review of the FCC orders, and the arguments advanced by the parties, we conclude that the rules adopted by the FCC are, *for the most part,* reasonable and consistent with the provisions of the Cable Act. However, we also find that several aspects of the FCC's rules are either arbitrary or inconsistent with the Act. Accordingly, we affirm in part and reverse and remand in part.

## I. BACKGROUND

### A. *A Synopsis of Cable Television Regulation Prior to Enactment of the Cable Act*

The Communications Act of 1934, Pub.L. No. 73–416, 48 Stat. 1064 (codified as amended in scattered sections of 47 U.S.C.),

---

* Judge Edwards authored Parts I, II.A. and II.B. Judge Starr authored Parts II.A.2. and II.A.3.

Judge Buckley authored Parts II.C. and II.D.

grants the FCC broad authority to regulate all aspects of interstate communication by wire or radio. *See generally Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699–700, 104 S.Ct. 2694, 2700–2701, 81 L.Ed.2d 580 (1984); *United States v. Southwestern Cable Co.,* 392 U.S. 157, 167–68, 88 S.Ct. 1994, 1999–2000, 20 L.Ed.2d 1001 (1968). Prior to passage of the Cable Act in 1984, however, the Communications Act did not speak directly to regulation of cable television.[1] Faced with this congressional silence, the FCC—with the approval of the Supreme Court—undertook to regulate cable in those circumstances where regulation was "reasonably ancillary to the effective performance of the Commission's ... [recognized] responsibilities for the regulation of television broadcasting." *Southwestern Cable,* 392 U.S. at 178, 88 S.Ct. at 2005; *see also Capital Cities Cable,* 467 U.S. at 699–705, 104 S.Ct. at 2700–04; *United States v. Midwest Video Corp.,* 406 U.S. 649, 667–70, 92 S.Ct. 1860, 1870–72, 32 L.Ed.2d 390 (1972); *Quincy Cable TV, Inc. v. FCC,* 768 F.2d 1434, 1439 (D.C.Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986).

The FCC, however, was not the only governmental body which asserted an interest in regulating the cable medium. Municipalities (or "franchising authorities") also exercised authority in regulating cable for the benefit of the residents in their communities. In virtually all communities serviced by cable, the municipality determined whether to grant a franchise authorizing a particular company to provide cable service to a specified portion of the community. In exchange for a cable franchise, cable operators were required to assume various responsibilities in the public interest.[2] Typically, franchise agreements obligated cable operators to pay a specified "franchise fee," and to market their services in accordance with rates established by the municipality.

In some respects, the FCC did not interfere with the efforts of local communities to regulate cable television. In at least two important areas, however, the FCC did assume a preemptive regulatory role. First, it placed a cap on the fees that a franchising authority could charge a cable operator for the right to provide cable service. *See* 47 C.F.R. § 76.31 (1983) (now deleted). The asserted purpose of this regulation was to prohibit local franchising authorities from stunting the growth of an increasingly important communications medium through the imposition of excessive fees. *See generally Cable Television Report and Order,* 36 F.C.C.2d 143, 209 (1972). Second, the Commission preempted local rate regulation of "nonbasic" or "pay" services, while allowing franchising authorities to regulate the rates charged for the "basic" level (or "tier") of service offered by the cable operator to all subscribers.[3] The Commission reasoned that

---

1. Congress incorporated the Cable Act into the Communications Act of 1934. By virtue of this incorporation, the Communications Act now contains a Title VI entitled "Cable Communications." *See* 47 U.S.C. §§ 521–522, 531–533, 541–547, 551–559 (Supp. III 1985).

2. Traditionally, one of the justifications for local regulation of cable television has been the fact that cable companies must tear up city streets or string cable along utility poles in order to provide cable service. In granting this right to "use" public resources, municipalities have imposed various responsibilities on the beneficiaries of their largesse. *See, e.g., Community Communications Co. v. City of Boulder,* 660 F.2d 1370, 1377–78 (10th Cir.1981), *cert. dismissed,* 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982). The existence of physical and economic limitations on the number of cable systems that can be constructed and oper-

ated in a single community has also been cited as a justification for local regulation. *See id.* at 1378–79; *but see Quincy Cable TV,* 768 F.2d at 1449–50 (discounting both of these rationales).

3. "Basic" services typically include retransmission of local broadcast signals, access channels, and satellite programming such as CNN and ESPN. The exact number and variety of services that are included in the basic tier will vary— sometimes dramatically—from community to community. "Nonbasic" services, as the term would suggest, are not included in the tier of service regularly provided to all subscribers. Nonbasic services typically include the "premium" movie and sports channels such as HBO and Sportschannel. Recently, however, the traditional distinctions between "basic" and "nonbasic" services have begun to blur at the margin, as cable operators experiment with alternative means of marketing their services.

"pay" services were typically subject to competition from a number of sources, making rate regulation both unnecessary and unwise. *See generally In re Community Cable TV, Inc.*, 95 F.C.C.2d 1204, 1216–17 (1983).

## B. *The Cable Act*

This was the state of affairs when Congress enacted the Cable Act in 1984. Although both the FCC and local governments asserted regulatory authority over cable television, the breadth of their respective powers was illdefined. Responding to this state of regulatory uncertainty, Congress passed the Cable Act in large measure to "establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems." Section 601(3), 47 U.S.C. § 521(3) (Supp. III 1985). In establishing regulatory guidelines, Congress was concerned *both* with relieving the cable industry from unnecessary, burdensome regulation *and* with ensuring that cable systems remain responsive to the needs of the public. *See* § 601(2), (4), (6), 47 U.S.C. § 521(2), (4), (6). Our task in this case is to decide whether the rules adopted by the FCC have impermissibly altered the balance struck by Congress.

In the Cable Act, Congress addressed both the regulation of cable rates and the permissible level of franchise fees. Section 623 of the Act, 47 U.S.C. § 543, explicitly delegates rulemaking authority to the FCC in the area of rate regulation. Section 623(b)(1) instructs the FCC, within 180 days after enactment of the Act, to "prescribe and make effective regulations which authorize a franchising authority to regulate rates for the provision of *basic cable service* in circumstances in which a cable system is *not subject to effective competition.*" 47 U.S.C. § 543(b)(1) (emphasis add-

ed). For purposes of these regulations, the FCC must (1) "define the circumstances" in which a cable system is not subject to "effective competition;" and (2) establish "standards" for rate regulation in those circumstances where effective competition does not exist. Section 623(b)(2), 47 U.S.C. § 543(b)(2).

In the area of franchise fees, Congress did not expressly delegate adjudicatory or regulatory authority to any particular administrative, judicial or legislative body.[4] Congress did, however, impose a uniform, federal standard on the level of franchise fees. Specifically, it provided that an annual franchise fee may not exceed five percent of a cable operator's gross revenues. Section 622(b), 47 U.S.C. § 542(b). Congress defined a "franchise fee" as "any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such." Section 622(g)(1), 47 U.S.C. § 542(g)(1). Congress further specified that a "franchise fee" does not include a tax, fee or assessment of "general applicability," provided that the assessment is not "unduly discriminatory" against cable operators or subscribers. Section 622(g)(2)(A), 47 U.S.C. § 542(g)(2)(A).

Congress, it must be noted, legislated in numerous areas other than rate regulation and franchise fees. For present purposes, however, it is necessary to highlight only a few of the Act's other provisions. Sections 611 and 612 of the Act, 47 U.S.C. §§ 531, 532, relate to the designation of "access" channels by cable operators. Section 611 empowers franchising authorities, in their discretion, to require that cable operators designate channels for public, educational and governmental use. Section 612, in turn, imposes the direct requirement that certain [5] cable operators designate channel

---

**4.** Several other provisions of the Act, by contrast, delegate adjudicatory or regulatory tasks to a particular governmental body. *See, e.g.,* § 623, 47 U.S.C. § 543 (FCC empowered to issue rate regulations), § 612(d), 47 U.S.C. § 532(d) (federal district courts empowered to determine whether denial of commercial access by cable operator was reasonable), § 611, 47 U.S.C. § 531 (franchising authorities may require ca-

ble operators to designate channels for public, educational or governmental use).

**5.** The obligation to provide commercial access, and the extent to which access must be provided, is determined by the channel capacity of the cable operator. The obligation to provide commercial access is not triggered at all unless the

capacity for commercial use by unaffiliated persons.[6] Each of these provisions was designed to "assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public." Section 601(4), 47 U.S.C. § 521(4).

In harmony with the statutory goal of broadening the availability and diversity of cable programming, section 621(a)(3), 47 U.S.C. § 541(a)(3), requires a franchising authority to assure that access to cable service is not denied to any group "because of the income of the residents of the local area in which such group resides." This provision is a direct attempt to prohibit the practice of "redlining," by which cable operators refuse to wire low-income neighborhoods for cable service. *See* H.R.REP. NO. 934, 98th Cong., 2d Sess. 59, *reprinted in* 1984 U.S. CODE CONG. & ADMIN.NEWS 4655, 4696 (*"House Report"*). Finally, section 624(d)(2)(A), 47 U.S.C. § 544(d)(2)(A), requires cable operators to provide a "device" (or lock box) by which a subscriber can prohibit the viewing of a "particular cable service." The stated purpose of this statutory provision is to enable cable subscribers to restrict the viewing of programming that they consider "obscene or indecent." *Id.*

## C. *The Commission's Rules*

Shortly after passage of the Cable Act, the FCC initiated a rulemaking to implement the Act's various provisions. After receiving comments from over 140 parties, including cable companies and their trade associations, municipalities, public interest groups and the Antitrust Division of the Department of Justice, the Commission issued its Report and Order in *Implementation of the Provisions of the Cable Communications Policy Act of 1984* (*"Report and Order"*), 50 Fed.Reg. 18,637 (1985).

The primary focus of the rulemaking was to identify the circumstances and conditions under which franchising authorities would be permitted to regulate the rates charged by cable operators for "basic cable service." Because section 623 of the Act expressly instructed the FCC to permit local rate regulation in those circumstances where cable systems did not face "effective competition," the critical question before the FCC was how to measure the existence of "effective competition." Based on the comments submitted by the various parties, an internal staff study and materials drawn from the economic literature, the Commission concluded that effective competition would be deemed to exist where any three "off-the-air"[7] broadcast signals were "available" in the cable community. *See Report and Order*, 50 Fed.Reg. at 18,648–50. The Commission ruled that a broadcast signal would be deemed "available" in either of the following circumstances: (1) the signal placed a predicted Grade B contour over *any* portion of the cable community;[8] or (2) the signal was

---

cable system has a channel capacity of 36 or more. *See* § 612(b)(1), 47 U.S.C. § 532(b)(1).

**6.** Intervenor Gary Christensen—a cable subscriber—asks this court to invalidate §§ 611 and 612 on the grounds that they violate the First and Fifth Amendment rights of cable operators. We decline to address Christensen's challenge for two reasons. First, although Christensen's challenge is styled as a petition for review of an order of the FCC, it is in reality a facial constitutional challenge to the validity of §§ 611 and 612. Accordingly, Christensen was required to file his claim in federal district court under the general federal question statute, 28 U.S.C. § 1331 (1982).

Second, Christensen has plainly failed to establish that he has standing to adjudicate his claim. As noted above, Christensen seeks relief based on alleged violations of the constitutional rights of cable operators. Subject to certain exceptions, however, a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 509–10, 95 S.Ct. 2197, 2205, 2210–11, 45 L.Ed.2d 343 (1975). Here, Christensen has failed to establish that he falls within any of the exceptions to this general rule.

**7.** An "off-the-air" broadcast signal is one that is transmitted by a "local" television station and received directly by a consumer by means of a home antenna, as opposed to a signal available only through cable or satellite transmission. *See Notice of Proposed Rulemaking*, 49 Fed.Reg. 48,765, 48,770 (1984).

**8.** A "predicted Grade B contour" is a measurement of the anticipated strength of a broadcast signal. Use of the Grade B contour enables the FCC to predict the "approximate extent" to

"significantly viewed" in the community.[9] *See id.* at 18,650–51. Franchising authorities, however, would be permitted to submit "showings and engineering studies" indicating that a signal was not "in fact" available "anywhere" within the cable community. *Id.* at 18,651.

Having settled on a definition of "effective competition," the FCC went on to prescribe "standards" of rate regulation for those franchising authorities (few in number, as the FCC concedes) that would retain the authority to regulate "basic cable" rates under the Commission's rules. Three of those "standards" are pertinent here. First, the FCC adopted a definition of the term "basic cable service." Although the Act itself contains a definition of this phrase,[10] the Commission found that the Act's legislative history authorized it—for the purpose of adopting rate regulation "standards"—to fashion an alternative definition. The Commission exercised this

purported authority by defining "basic cable service" as "*the* tier of service regularly provided to all subscribers that includes the retransmission of all must-carry broadcast television signals."[11] *Report and Order,* 50 Fed.Reg. at 18,653 (emphasis added).

Second, the FCC permitted cable operators to pass through to their subscribers certain "identifiable" costs incurred in the provision of basic service. These costs, the Commission found, could *automatically* be incorporated in the operator's rates without franchising authority approval. *Id.* at 18,-654–55. Third,[12] the FCC granted a one-year exemption from rate regulation to those cable operators who become subject to regulation by virtue of changed circumstances.[13] This one-year exemption, the Commission reasoned, would give a cable operator sufficient time to make the transition from an unregulated to a regulated entity. *Id.* at 18,651.

which a signal is viewable in the community covered by the contour. *See* 47 C.F.R. § 73.-683(a) (1985). The predicted contour, however, is based on general engineering principles, and does not take into account site-specific factors that could affect the actual broadcast signal strength in a community. Thus, the predicted contour does not take into account the extent to which "terrain" or "interference" disturbs the ability of viewers to receive a clear picture. *Id.* Nor does it guarantee that a picture will *in fact* be "viewable" by those within the range of the contour even in the absence of hilly terrain or other interference. Of course, "viewability" of a signal is a subjective concept; what constitutes a "viewable" picture for some may not be satisfactory to others.

9. A signal is considered to be "significantly viewed" if it is watched by a certain percentage of viewers in a community. The percentage share that a signal must attain to be considered significantly viewed varies depending on whether the television station is a network affiliate or an independent. 47 C.F.R. § 76.54 (1985) references a list of broadcast signals that the FCC currently considers to be significantly viewed. The FCC has established waiver procedures, however, by which franchising authorities may demonstrate that signals listed as significantly viewed should no longer qualify for that status. *See In re KCST–TV, Inc.,* 59 Rad.Reg.2d (P & F) 1270, 1274 (1986). The Commission is in the process of revising its rules to formalize these procedures.

10. The Act defines "basic cable service" as "*any* service tier which includes the retransmission

of local television broadcast signals." Section 602(2), 47 U.S.C. § 522(2) (emphasis added).

11. This court recently invalidated the FCC's "must-carry" rules in *Quincy Cable TV, Inc. v. FCC,* 768 F.2d 1434 (D.C.Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986). In response to this decision, the Commission revised its definition of basic cable service to replace the reference to "must-carry" signals with the specific characteristics that had formerly qualified signals for "must-carry" status. *See Cable Television; Reconsideration of the Implementation of the Cable Communications Policy Act of 1984,* 51 Fed.Reg. 21,770, 21,771 (1986). This technical change, however, does not alter the basic feature of the definition; namely, that franchising authorities may regulate only the *single* tier of service regularly provided to all subscribers.

12. In its order the Commission did not refer to this third rule as a "standard" of rate regulation. *See Report and Order,* 50 Fed.Reg. at 18,651. However, it has been treated as such by the parties, and for purposes of our analysis we will accept the parties' characterization.

13. For example, a cable operator in a community within the range of three Grade B contours would become subject to rate regulation under the Commission's rules if one of the broadcast stations in the community should go dark, reduce its power, or adjust the direction of its signal. *See id.*

In its *Report and Order*, the Commission also addressed the issue of franchise fees. Specifically, the Commission considered two distinct questions. The first was whether to retain its rule, 47 C.F.R. § 76.31 (1983), setting a cap on the level of franchise fees. The second was whether to continue the Commission's past practice of adjudicating disputes over whether a particular tax, fee or assessment imposed on cable operators constituted a "franchise fee" (and hence could be counted towards the cap on fees).

The Commission had little difficulty answering the first question; because the Cable Act itself had established a five percent limit on fees, there was no longer any need or justification for the Commission to retain its own limitation.[14] The Commission further announced that it would refuse to adjudicate disputes over whether particular taxes, fees or assessments could be deemed "franchise fees" under the definition provided by Congress in the statute. Essentially, the Commission found that the Cable Act had eliminated the need for it to regulate in the area of franchise fees, and that disputes concerning fees were "best resolved through the courts." *Report and Order*, 50 Fed.Reg. at 18,648.

The Commission then went one step further in its *Report and Order*. Rather than adopting its new enforcement policy on a prospective basis only, the Commission announced that it would not reinstate petitions that had been filed *prior* to enactment of the Cable Act. All such pending petitions had been dismissed by the Commission following enactment of the Cable Act, on a Commission finding, *inter alia*, that the Cable Act had limited its "jurisdic-

tion and authority" in the area of franchise fees.[15] In its *Report and Order*, in sustaining this policy of forbearance, the Commission reasoned that it no longer had a "regulatory interest" in adjudicating franchise fee disputes that had, in its judgment, been rendered "moot" by passage of the Cable Act. *Id.* at n. 55. The Commission did not reiterate its previous contention that the Cable Act had limited its "jurisdiction and authority" over franchise fees.

Two parties with franchise fee disputes pending before the FCC prior to enactment of the Cable Act—Yakima Valley Cablevision, Inc. ("Yakima") and the Connecticut Cable Television Association, Inc. ("CCTA"),[16]—brought suit in this court challenging both the Commission's policy of "forbearance" [17] and its decision to apply that policy retroactively to petitions pending prior to enactment of the Cable Act. In *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737 (D.C.Cir.1986), this court held that the FCC had not sufficiently explained its decision to apply its new policy retroactively.[18] We further held, however, that the petitioners' challenge to the FCC's prospective policy of forbearance was best raised in the instant case, reasoning that "the full sweep of the FCC's rationale is better understood in a careful review of the entire Cable Act rulemaking." *Id.* at 744.

Shortly before *Yakima* was decided, however, the Commission reexamined and modified its policy of "forbearance" in response to a petition for reconsideration. *See In re Amendment of Parts 1, 63 and 76 of the Commission's Rules to Implement the Provisions of the Cable Commu-*

---

**14.** Indeed, § 622(i), 47 U.S.C. § 542(i), provides that no "Federal agency" may regulate the amount of fees paid by a cable operator.

**15.** *See In re City of Southfield, Michigan*, FCC Mimeo No. 1442, order at 3 (released Dec. 19, 1984).

**16.** The issue that Yakima sought to adjudicate was whether a "business and occupation" tax levied upon it by the cities of Sunnyside and Grandview, Washington constituted a "franchise fee." The issue raised by CCTA was whether a "gross earnings tax" imposed on cable television

companies pursuant to a Connecticut statute was a "franchise fee." *See Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 742 (D.C.Cir. 1986).

**17.** In the suit brought by Yakima and CCTA, the FCC characterized its policy of not adjudicating franchise fee disputes as one of "forbearance."

**18.** On remand, the FCC agreed to resolve the status of taxes that had been imposed on Yakima and CCTA *prior* to enactment of the Cable Act. *See Yakima Valley Cablevision, Inc.*, 61 Rad.Reg.2d (P & F) 472 (1986).

*nications Policy Act of 1984 ("Reconsideration"),* 60 Rad.Reg.2d (P & F) 514 (1986). In its modified order, the Commission conceded for the first time that it retained jurisdiction to adjudicate franchise fee disputes arising under the Cable Act.[19] The Commission also abandoned its position that it no longer had a "regulatory interest" in entertaining *any* such disputes. Nevertheless, the Commission concluded that *most* franchise fee disputes were best resolved through the courts.[20] The Commission announced that it would entertain fee disputes only where the claim "directly impinge[d]" on a "national policy concerning cable communications" and implicated the agency's expertise. *Reconsideration,* 60 Rad.Reg.2d (P & F) at 518 (quoting § 601(1), 47 U.S.C. § 521(1)). In accordance with this policy, the Commission announced that it would *not* resolve disputes over whether particular local taxes could be considered "franchise fees" within the meaning of the Act. The Commission reasoned, *inter alia,* that it possessed no expertise in matters of local taxation, that "local courts"[21] were better situated to resolve such issues, and that the relevance of such matters to a national policy concerning cable communications was "slight." *Id.* at 518–19.

Finally, the Commission's *Report and Order* adopted three "interpretive" rules that are challenged by several petitioners herein.[22] The three rules pertain to the Act's requirement that cable operators provide lock boxes to interested cable subscribers, *see* § 624(d)(2)(A), 47 U.S.C. § 544(d)(2)(A), the requirement that franchising authorities prohibit the practice of

redlining, *see* § 621(a)(3), 47 U.S.C. § 541(a)(3), and the requirement that certain cable operators afford commercial access to unaffiliated persons, *see* § 612, 47 U.S.C. § 532. Because we will discuss these three interpretive rules in a separate subsection, we postpone until then a description of the rules and our analysis respecting their validity.

## II. ANALYSIS

### A. *Rate Regulation*

The FCC's rate regulation rules—which will effectively prohibit the regulation of cable rates in the overwhelming majority of local communities—are challenged by several individual municipalities, the National League of Cities and other interested parties. The petitioners launch a broad assault on virtually every argument cited by the FCC in support of its rules, and every component of the rules themselves. Thus, the petitioners assert that the FCC acted arbitrarily and irrationally in defining "effective competition" in terms of a *single* criterion (the availability of broadcast signals), in selecting "three" as the number of signals expected to offer sufficient competition to the myriad of services offered by cable systems, and in defining the availability of signals in terms of their *theoretical* viewability in the cable community. The petitioners also assail the rate regulation "standards" adopted by the FCC, arguing that they are arbitrary and inconsistent with the express terms of the Cable Act.

■ Upon careful consideration of the arguments raised by the petitioners, and

---

**19.** The Commission observed that § 1 of the Communications Act "provides that the Commission shall 'execute and enforce the provisions of [the] Act.'" *Reconsideration,* 60 Rad. Reg.2d (P & F) at 517. As noted earlier, the Cable Act has been incorporated into the Communications Act. *See* note 1 *supra.*

**20.** In the parties' briefs and at oral argument, this modified enforcement policy has been termed one of "partial" forbearance.

**21.** The Commission speculated that federal courts might be barred from adjudicating such tax disputes by the terms of the Tax Injunction Act, 28 U.S.C. § 1341 (1982). The Tax Injunction Act prevents federal district courts from

"enjoin[ing], suspend[ing] or restrain[ing] the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." The Tax Injunction Act prohibits even declaratory relief. *See California v. Grace Brethren Church,* 457 U.S. 393, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982).

**22.** The petitioners are the American Civil Liberties Union, the Cable Television Access Coalition, the National Federation of Local Cable Programmers and the New York Citizens' Committee for Responsible Media.

applying familiar principles of judicial review,[23] we conclude that the FCC's rate regulation rules are, for the most part, neither arbitrary, capricious nor otherwise contrary to law. With certain exceptions enumerated below, the FCC addressed the significant comments made in the rulemaking proceeding, articulated the basis for its conclusions, and adopted rules that are at a minimum "reasonable." It is irrelevant, of course, that we might have defined "effective competition" differently had we been presented in the first instance with the facts before the Commission. Having satisfied ourselves that the Commission carefully considered proposed alternatives, explained the reasons underlying its decision, and reached a rational conclusion, our role under the Administrative Procedure Act is largely at an end. Guided by these well-established principles of judicial review, we hold that the FCC's rate regulation rules are affirmed in all respects except to the extent specifically delineated below.

In concluding that the FCC's rate regulation rules are in most respects "reasonable," we note that the Cable Act grants the Commission broad discretion in constructing its definition of "effective competition." The Act itself offers no guidance on what factors the Commission should consider, or what weight it should assign to those factors. Unable to identify any such statutory directives, the petitioners place

substantial reliance on language in the House Report suggesting that the Commission should consider a *variety* of factors in framing its definition of "effective competition." [24] The same paragraph in the House Report, however, states that the FCC "*may* find it relevant" to consider factors in addition to the number of off-the-air broadcast stations available in a cable community. *Id.* (emphasis added). Even assuming, then, that the House Report can be viewed as a reliable indicator of congressional intent, the Report simply does not constrain the FCC's discretion in the manner urged upon us by petitioners. The FCC's mandate was to "consider" various alternatives, including, it seems, one in which effective competition would be measured solely in terms of the availability of off-the-air broadcast signals. The FCC considered the alternatives suggested by the commenters and offered cogent reasons for adopting a three-signal availability standard. It therefore cannot be said that the Commission acted arbitrarily, capriciously or otherwise contrary to law.

Before turning to those aspects of the Commission's rate regulation rules that *cannot* be upheld, one additional observation is in order. With admirable candor, the FCC concedes that its decision to define "effective competition" in terms of the availability of three broadcast signals was

23. All parties agree that the FCC's rules must be upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A) (1982). In *NAACP v. FCC,* 682 F.2d 993, 997–98 (D.C.Cir. 1982), this court summarized the basic framework for making this determination in the context of an agency rulemaking:

[The] agency action is presumed to be valid in the absence of a substantial showing to the contrary. The court's review is not merely a summary endorsement, however, but should be searching and careful. While the level of review is not to be perfunctory it is relatively narrow and designed only to ensure that the agency's decision is not contrary to law, is rational, has support in the record, and is based on a consideration of the relevant factors. This includes the agency's addressing the significant comments made in the rulemaking proceeding.... [W]e will demand that the Commission consider reasonably obvious alternative ... rules, and explain its

reasons for rejecting alternatives in sufficient detail to permit judicial review. At the same time, however, our review of the Commission's factual, and particularly its policy, determinations will perforce be a narrow one, limited to ensuring that the Commission has adequately explained the facts and policy concerns it relied on and to satisfying ourselves that those facts have some basis in the record. Finally, we must see "whether those facts and legislative considerations by themselves could lead a reasonable person to make the judgment that the Agency has made."

(citations omitted).

24. The Report states that the FCC "should consider the number and nature of [cable] services provided, compared with the number and nature of services available from alternative sources and, if so, at what price." *House Report* at 66, *reprinted in* 1984 U.S. CODE CONG. & ADMIN. NEWS at 4703.

not an exercise in "scientific precision."[25] Rather, the Commission made a predictive judgment based on the evidence it had accumulated in the relatively short time frame within which Congress directed the agency to complete its rulemaking. In light of the speed with which the FCC was compelled to act, and the statutory command that the Commission "periodically review" its rate regulation rules,[26] we wish to make clear that we fully anticipate that the Commission will carefully monitor the effects of its regulations and make adjustments where circumstances so require. In one sense, of course, our admonition is superfluous, since we would not expect the Commission to adhere blindly to regulations that are cast in doubt by new developments or better understanding of the relevant facts.[27] However, where the Commission itself has recognized the tentative nature of its predictive judgments, and alluded to the possibility that future studies will alter its principal conclusions, we find it particularly appropriate to emphasize the need for the Commission to vigilantly monitor the consequences of its rate regulation rules.

While the Commission's actions in general are not arbitrary, capricious, or otherwise contrary to law, we conclude that in several respects the Commission has gone astray. Specifically, three aspects of the Commission's rules cannot stand: (1) the redefinition of "basic cable service"; (2) the automatic pass through; and (3) the signal availability standard. We consider each in turn.

### 1. Redefinition of "Basic Cable Service"

Section 602(2) of the Cable Act defines the term "basic cable service" as follows:

[T]he term "basic cable service" means any service tier which includes the retransmission of local television broadcast signals.

47 U.S.C. § 522(2). However, in performing its statutory task of "establish[ing] standards for ... rate regulation," *id.* § 543(b)(2)(B), the Commission crafted a definition of "basic cable service" that departs materially from that set forth in the statute:

Basic cable service is the tier of service regularly provided to all subscribers that includes the retransmission of all must-carry broadcast signals ... and the public educational and governmental channels, if required by a franchising authority....

*Report and Order,* 50 Fed.Reg. at 18,653.[28]

There is an important distinction between these two definitions with respect to the treatment of cable systems configured so as to include broadcast signals on every tier.[29] As Congress has defined the term,

---

**25.** Brief for the Federal Communications Commission at 36.

**26.** *See* § 623(b)(3), 47 U.S.C. § 543(b)(3). Section 623(h), 47 U.S.C. § 543(h), also directs the FCC to conduct a study and submit a report to Congress within six years outlining the effects of its regulations on "competition in the marketplace."

**27.** *Cf. American Trucking Ass'ns v. Atchison, T. & S.F. Ry.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967) ("Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy.").

**28.** After this court overturned the FCC's "must-carry" rules in *Quincy Cable TV, Inc. v. FCC,* 768 F.2d 1434 (D.C.Cir.1985), the Commission solicited comment on the ramifications of *Quincy* for the definition of "basic cable service." The FCC concluded that *Quincy's* invalidation of the must-carry rules posed only a technical problem and accordingly amended the definition to omit reference to the must-carry rules and substitute the specific characteristics that had qualified broadcast signals for must-carry status. *See* note 11 *supra.*

**29.** Cable operators typically market their service by bundling an assortment of channels together and offering them as a group, or "tier." At least two tiers are usually available. Thus, for example, a cable operator may offer local broadcast signals plus some satellite delivered services, such as CNN and ESPN, as "Tier *A,*" and offer a variety of premium services, such as Home Box Office or the Disney Channel, as "Tier *B.*" A subscriber will almost invariably be required to purchase Tier *A* to receive Tier *B.* Precisely how to configure its offerings is, under the Cable Act, generally left to the operator's discretion. *See* 47 U.S.C. § 545(d) (permitting rear-

"basic cable service" would encompass these multiple tiers of cable service, since the statutory definition refers to "any service tier." Under this system, any tier that includes the "retransmission of local television broadcast signals," even if this encompassed every tier offered by a cable operator, would be considered "basic cable service." *Cf.* House Report at 40 (recognizing statutory definition could involve labeling multiple tiers to be "basic cable service"), *reprinted in* 1984 U.S.CODE CONG. & AD.NEWS at 4677.

Under the Commission's system, on the other hand, only one service tier of a particular cable system can be labeled "basic cable service," regardless of whether that cable operator configures its system so that each tier includes local broadcast signals. The Commission's stated justification for its departure from the statutory language is the Cable Act's legislative history, a portion of which suggests that the FCC has discretion to announce a new definition.[30] Specifically, the FCC rests on the following language from the House Report:

> The Committee wishes to stress that it intends to give the Commission flexibility in promulgating these regulations. The definition in Sec. 602 [47 U.S.C. § 522(2)] of basic cable service is intended primarily for use in determining the extent of regulation that will be permitted during the ... transition period. The regulations of the Commission under [subsection 623(b), 47 U.S.C. § 543(b)] serve a

different purpose—defining the circumstances and extent of regulation that may occur beyond the transition period. As such, the Commission may fashion a definition of basic cable services most appropriate to achieve the purpose of the regulations, consistent with the provisions of Title VI.

*Id.* at 66, *reprinted in* 1984 U.S.CODE CONG. & ADMIN.NEWS at 4703; *see also* FCC Brief at 11–12 (invoking House Report language); *Report and Order,* 50 Fed.Reg. at 18,652 (same). With this go-ahead from the legislative history, the Commission invokes what it perceives to be the general deregulatory focus of the Act, *Report and Order,* 50 Fed.Reg. at 18,652–53, as well as prior "longstanding" Commission precedents, *id.* at 18,653, both of which, in the Commission's view, counsel in favor of a narrower definition of basic cable service than that set forth in the statute.

Also featured prominently in the FCC's explication is the argument that application of the statutory definition would lead to anomalous results. *See* FCC Brief at 19–20; *Report and Order,* 50 Fed.Reg. at 18,653 & n. 81. Specifically, use of the section 602(2) definition could lead to two different cable companies offering identical services having a different number of service tiers being considered "basic cable service"; this critical difference would thus be based solely on the way these two hypothetical cable operators chose to market their services.[31] In the Commission's view,

---

rangement so long as no service tier is subject to rate regulation).

**30.** The FCC also points to the broad discretion the Cable Act confers upon it, as well as more generic principles of deference to administrative agencies. *See, e.g.,* FCC Brief at 31 n. 22, 33.

**31.** This can be seen by considering hypothetical cable operators *X* and *Y,* each of which offer three service tiers. Operator *X* markets its services as follows: (1) Tier *A,* consisting of local broadcast signals and a weather channel, for $10 per month; (2) Tier *B,* consisting of the satellite services ESPN and CNN, for $5 per month; and (3) Tier *C,* consisting of Home Box Office and the Disney Channel, for $10 per month. Operator *X* requires that subscribers

purchase Tier *A* in order to purchase Tier *B,* and to purchase Tiers *A* and *B* in order to purchase Tier *C.* Operator *Y,* in contrast, markets its services in this way: (1) Tier 1, consisting of local broadcast signals and a weather channel, for $10 per month; (2) Tier 2, consisting of local broadcast signals, a weather channel, ESPN, and CNN, for $15 per month; and (3) Tier 3, consisting of local broadcast signals, a weather channel, ESPN, CNN, Home Box Office, and the Disney Channel, for $25 per month. A subscriber purchasing Tiers *A, B,* and *C* from cable operator *X* is obviously receiving the same services, at the same price, as a subscriber purchasing Tier 3 from operator *Y.* Yet, because cable operator *Y* employs a cumulative, rather than an incremental, marketing and pricing approach, it faces the prospect of having Tiers 1, 2, and 3 all subject to rate regulation if

applying the statutory definition and reaching different results for two such companies would represent a triumph of form over substance. Such a result, the FCC argues, is "clearly not intended by the statute." *Report and Order,* 50 Fed.Reg. at 18,653 n. 81; *see also* FCC Brief at 20 (labeling every tier of cable service as basic cable service "would clearly contravene the legislative intent and the statutory definition of basic cable service was therefore rejected by the Commission"). *But cf.* House Report at 40 ("The Committee recognizes that ... [i]n some franchises this [definition] will mean that basic cable service includes multiple service tiers."), *reprinted in* 1984 U.S.Code Cong. & Admin. News at 4677.

This rather technical, definitional dispute is significant because under the Cable Act only "basic cable service" is potentially subject to rate regulation by local franchising authorities. *See* 47 U.S.C. § 543(b). Thus, the definition of "basic cable service" sets the parameters of the respective jurisdictions of local franchising authorities and the Commission. The fact that construction of the statutory term directly impacts such jurisdictional determinations should, in our view, be factored into a proper analysis of the statutory issue we face. *Cf. Board of Governors v. Dimension Financial Corp.,* 474 U.S. 361, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986).[32] That issue may be simply stated: Does the FCC enjoy discretion to adopt, as part of its regulations implementing the Cable Act, a definition of a particular term that is at odds with a

definition of that very term contained in the Act itself? The question, we believe, answers itself. The Commission, however, answers yes.

Our task "in assessing a claim that an agency action contravenes its governing statute," *FAIC Securities, Inc. v. United States,* 768 F.2d 352, 361 (D.C.Cir.1985), has been marked out by the Supreme Court in *Chevron, USA v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). We are instructed to first determine

> whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

*Id.* at 842–43, 104 S.Ct. at 2781–82. It is only if Congress' intent is "silent or ambiguous" that we consider, and grant deference to, the agency's construction. *Id.* at 843, 104 S.Ct. at 2782.

In making this determination of whether "Congress had an intention on the precise question at issue," the *Chevron* Court indicated that we were to employ "traditional tools of statutory construction." *Id.* at 843 n. 9, 104 S.Ct. at 2782 n. 9. The Commission employs a tool of statutory analysis, focusing solely on one passage from the House Report accompanying the Cable Act. As mentioned above, that passage indicates that the statutory definition was to apply

the statutory definition were used. Operator *X,* on the other hand, has only one service tier, Tier *A,* potentially subject to rate regulation if the statutory definition were employed. In contrast, under the Commission's definition only one tier would be potentially subject to rate regulation in each cable system—in Operator's *X*'s system, Tier *A,* and in operator *Y*'s system, Tier 1.

**32.** In our view, a pivotal distinction exists between statutory provisions that are jurisdictional in nature—that is, provisions going to the agency's power to regulate an activity or substance, *cf. Board of Governors v. Dimension Financial Corp.,* 474 U.S. 361, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986)—and provisions that are managerial—that is, provisions pertaining to the

mechanics or inner workings of the regulatory process, *cf. Young v. Community Nutrition Institute,* 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986). Where the issue is one of whether a delegation of authority by Congress has indeed taken place (and the boundaries of any such delegation), rather than whether an agency has properly implemented authority indisputably delegated to it, Congress can reasonably be expected both to have and to express a clear intent. The reason is that it seems highly unlikely that a responsible Congress would implicitly delegate to an agency the power to define the scope of its own power. When an agency's assertion of power into new arenas is under attack, therefore, courts should perform a close and searching analysis of congressional intent, remaining skeptical of the proposition that Congress did not speak to such a fundamental issue.

"primarily" during the two-year transition period, and that after this period the Commission could fashion its own definition consistent with the provisions of the Act. *See Report and Order*, 50 Fed.Reg. at 18,652 (quoting House Report at 66, *reprinted in* 1984 U.S. CODE CONG. & ADMIN. NEWS at 4703). But the Commission's argument has overlooked an important component of a proper statutory analysis. While legislative history is undoubtedly one of the "traditional tools" of which *Chevron* speaks, it is beyond cavil that the first step in any statutory analysis, and our primary interpretive tool, is the language of the statute itself. *See, e.g., Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985) ("It is axiomatic that '[t]he starting point in every case involving construction of a statute is the language itself.' ") (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)); *Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978) (same, citing other cases). This case poignantly illustrates the wisdom of this principle, for in leapfrogging ahead to the legislative history without carefully dwelling on the statute itself, the Commission has fallen into interpretive error.

Turning to the language of the statute, we find that on the issue of defining "basic cable service," the statute speaks with crystalline clarity. It provides a precise definition in section 602(2) for the exact term the Commission now seeks to redefine. The statute in no wise indicates that the 602(2) definition is only transitory. From the face of the statute then, we are left with no ambiguity and thus no need to resort to legislative history for clarification. As this court has stated, "[o]nly where [the statutory] expression is genuinely ambiguous," *FAIC Securities*, 768 F.2d at 362, is legislative history useful or necessary. *Id.; see also Burlington N. R.R. v. Oklahoma Tax Comm'n*, — U.S. —, 107 S.Ct. 1855, 1859-60, 95 L.Ed.2d 404 (1987); *Maine v. Thiboutot*, 448 U.S. 1, 6 n. 4, 100 S.Ct. 2502, 2505 n. 4, 65 L.Ed.2d

555 (1980) ("Where the plain language ... is as strong as it is here, ordinarily 'it is not *necessary* to look beyond the words of the statute.' ") (quoting *TVA v. Hill*, 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978) (emphasis in original)); *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1961) ("Having concluded that [the statutory provisions] are clear and unequivocal on their face, we find no need to resort to the legislative history of the Act.").

The Supreme Court recently followed such an interpretive approach in an analogous setting in *Board of Governors v. Dimension Financial Corp.*, 474 U.S. 361, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986). *Dimension Financial* presented the Court with two Federal Reserve Board regulatory definitions which conflicted with statutory provisions. In considering one such regulatory provision—the Board's definition of "demand deposit"—the Court looked only to the statutory language, which it found conclusive. The Court did not even cite any legislative history in this phase of its analysis, despite the fact that the Tenth Circuit had considered the statute's legislative history. *See* 744 F.2d 1402, 1407–08 (10th Cir.1984).

Following the Supreme Court's lead, we similarly decline to give overmuch weight to the measure's legislative history inasmuch as we find the pertinent part of the statute clear and unambiguous. The general interpretive principle—a reluctance to rely upon legislative history in construing an *unambiguous* statute—is of especial force where, as here, resort to legislative history is sought to support a result *contrary* to the statute's express terms. Whatever the limitations of the "plain meaning" rule in the run-of-the-mine case, "[w]e find no mandate in logic or in case law for reliance on legislative history to reach a result *contrary* to the plain meaning of a statute." *United Air Lines, Inc. v. CAB*, 569 U.S. 640, 647 (D.C.Cir.1977) (emphasis in original); *see also IBEW, Local No. 474 v. NLRB*, 814 F.2d 697, 712 (D.C.Cir.1987); *Universal City Studios v. Sony Corp.*, 659 F.2d 963, 968–69 (9th Cir.

1981); *Beacon Looms, Inc. v. S. Lichtenberg & Co.*, 552 F.Supp. 1305, 1310 (S.D.N.Y.1982) (It is "clear that a plain reading of an unambiguous statute cannot be eschewed in favor of a contrary reading, suggested only by the legislative history and not by the text itself."); *cf. United States v. American College of Physicians*, 475 U.S. 834, 106 S.Ct. 1591, 1598–99, 89 L.Ed.2d 841 (1986) ("[D]espite the [Committee] Report's seeming endorsement of a *per se* rule, we are hesitant to rely on that inconclusive legislative history either to supply a provision *not* enacted by Congress ... or to define a statutory term enacted by a prior Congress.... We agree, therefore, with ... [the] rejection of the ... argument that ... Congress intended to establish a *per se* rule.") (citations omitted).

This is precisely the temptation to which the FCC would have us succumb. The Commission asks us to disregard clear statutory language and embrace contraindications found in a committee report, but which are not without ambiguity themselves. Even if the pertinent passage from the House Report is seen as speaking with complete clarity, the fact remains that committee reports, even authoritative committee reports,[33] are not law. *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1570 n. 13 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). Accordingly, we decline the Commission's invitation. We will not permit a committee report to trump clear and unambiguous statutory language. Rather, because there is no ambiguity on the face of the statute,[34] we believe that the definition of "basic cable service" established by Congress in section 602(2) should apply in all circumstances.[35]

In our view, application of the statutory definition will not lead to unreasonable results. *Cf. United Air Lines*, 569 F.2d at 647. As noted above, *see* pp. 1566–67, *supra*, the FCC complains that the statutory definition, by sanctioning the labeling of multiple service tiers as "basic cable service," will lead to different treatment of cable operators based solely on marketing differences. This type of "form over substance" result may indeed be the upshot of the statutory definition. But such a result is hardly absurd. *Cf. Commissioner v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965) ("Unquestionably the courts, in interpreting a statute, have some 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results.'") (quoting *Helvering v. Hammel*, 311 U.S. 504, 510–

---

**33.** The report at issue here was drafted by the House Committee on Energy and Commerce but was specifically adopted by both the House and Senate as their explanations of the Act. *See* 130 Cong.Rec. S14,285 (daily ed. Oct. 11, 1984); 130 Cong.Rec. H12,245 (daily ed. Oct. 11, 1984).

**34.** Our independent examination of the Cable Act reveals only one potential ambiguity with respect to the universal applicability of section 602(2)'s definition of "basic cable service." Specifically, section 623(c)(1), in discussing the extent of rate regulation to be allowed during the two-year transition period, indicates that

 the franchising authority may, to the extent provided in a franchise—
 (1) regulate the rates for the provision of basic cable service, *including multiple tiers of basic cable service.*
 47 U.S.C. § 543(c)(1) (emphasis added).

The fact that Congress felt it necessary to qualify the term "basic cable service," as well as the context—section 623(c) deals with the transition period—lends some credence to the FCC's theory that the section 602(2) definition applies only during the transition period and perhaps injects some ambiguity into the statutory scheme with respect to the applicability of section 602(2)'s definition. If section 623(c)(1) is read in this way, then resort to the legislative history may well be appropriate, and the House Report language trumpeted by the Commission would have some force. However, neither the FCC nor intervenors in support of the FCC have advanced such an interpretation. And, more importantly, this view of section 623(c)(1) is nowhere to be found in the *Report and Order.* Accordingly, we do not consider this potential argument.

**35.** *Cf. Train v. City of New York*, 420 U.S. 35, 45, 95 S.Ct. 839, 845, 43 L.Ed.2d 1 (1975) ("[L]egislative intention, without more, is not legislation."); *International Union, United Automobile, Aerospace Agricultural Implement Workers v. Donovan*, 746 F.2d 855, 860 (D.C.Cir.1984) (same, quoting *Train* ); Jackson, *Problems of Statutory Interpretation*, 8 F.R.D. 121 (1948) ("'We do not inquire what the legislature meant, we ask only what the statute means.'") (quoting Holmes, J.).

11, 61 S.Ct. 368, 371–72, 85 L.Ed. 303 (1941)); *In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978) (same; quoting *Commissioner v. Brown*). Under the Cable Act, cable operators generally have the freedom to structure their service tiers in whatever way they wish. 47 U.S.C. § 545(d). While application of the statutory definition may lead them to choose one structure over another, this is hardly unreasonable. In any event, we discern no difficulties with application of the statutory definition that would lead us to reject it as irrational, unreasonable, or absurd.

In sum, applying the "traditional tools of statutory construction," *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9, we are persuaded that Congress did indeed have an intent on the "precise question at issue." *Id.* at 842, 104 S.Ct. at 2781. This is not a situation where Congress has left gaps for the agency to fill. *Cf. id.* at 843–44, 104 S.Ct. at 2781–82. Rather, Congress has spoken directly and specifically by providing a definition of the exact term the Commission now seeks to redefine. And as noted above, Congress intended its definition of "basic cable service" to be just that—a comprehensive definition of the term. We are instructed by *Chevron* that "that is the end of the matter" and directed to "give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82. We do so and hold that the Commission's redefinition of "basic cable service" is contrary to law; the Commission must apply the section 602(2) definition.

### 2. *Automatic Pass Through*

In addition to directing the FCC to develop regulations defining the circumstances in which effective competition exists (and rate regulation is therefore permissible), section 623 of the Act instructs the Commission to "establish standards for such rate regulation." 47 U.S.C. § 543(b)(2)(B). In its *Notice of Proposed Rulemaking,* the Commission described this task as "not only specifying what services can be regulated but also in what manner." 49 Fed. Reg. at 48,771.

After noting that it was provided "no specific guidance regarding the establishment of a rate regulation standard," the FCC offered its "tentative view" as to what administrative procedures should be used by franchising authorities in setting rates. *Id.* Then, "[w]ith respect to the substance of the rate making decision," *id.,* the Commission discussed its preference for a "zone of reasonableness" approach, and "[a]ccordingly ... propose[d] that franchise authorities may prescribe rates that are within 10 percent, either above or below, of the average rate of the comparable cable systems." *Id.*

In its *Report and Order,* the Commission reported that in their comments on these proposed rate regulation standards a number of cable interests had recommended that automatic "pass-throughs" be permitted. The FCC agreed:

> Accordingly, our rules will permit cable systems to automatically pass through any readily identifiable increase (or decrease) in cost which is entirely attributable to the provision of basic service, *e.g.,* the price of programming appearing on the basic service tier and copyright fees for retransmission of distant broadcast signals appearing on the basic service tier. These rate increases may be taken in addition to the 5% automatic annual increase to which most cable systems are entitled.

*Report and Order,* 50 Fed.Reg. at 18,655. The only rationale the FCC offered for this ruling is avoidance of what would be *pro forma* administrative proceedings, by virtue of the fact that the requested rate increase in such circumstances is due solely to increased cost. *See id.* ("value of automatic pass through ... is the avoidance of *pro forma* administrative proceedings").

As noted above, the FCC promulgated this pass-through rule in the course of establishing "standards for rate regulation," thereby purporting to rely on section 623, or more precisely subsection 623(b)(2)(B), as authority. We conclude, however, that erecting this pass-through mechanism exceeded the Commission's authority under

section 623. That provision begins with the admonition that "[a]ny federal agency ... may not regulate ... rates except to the extent provided under this section." 47 U.S.C. § 623(a). Given that delimiting provision, the FCC would seem to be impermissibly stretching the bounds of its lawful power when it uses a general direction to establish "standards for rate regulation" to justify direct regulation of the permissible amount of a rate increase.

But that is not all. In establishing the automatic pass through, the Commission has done more than potentially exceed the authority granted to it in subsection 623(b)(2)(B). The Commission has sought to employ this general power to fill a gap, as it were, by permitting automatic pass throughs. The problem is that no gap exists. The pass-through rule addresses a subject matter comprehensively treated by Congress in the Cable Act; indeed, this very subject is covered in other subsections of section 623.

Subsection (e)(1) of section 623 by its terms permits an automatic five percent per year increase "at the discretion of the cable operator." 47 U.S.C. § 543(e)(1). This increase is to be "[i]n addition to any other rate increase which is subject to the approval of a franchising authority." *Id.* Moreover, a different subsection of section 623, subsection (d), permits a cable operator to treat as granted any request for a rate increase on which the franchising authority does not act within 180 days. *Id.* § 543(d).

Taken together, these provisions create an elaborate scheme for automatic rate increases. By sanctioning such automatic increases, Congress was addressing concerns similar to those animating the FCC's development of its automatic pass through. Indeed, it would seem that the concerns were identical. The House Report indicates that the subsection (e)(1) automatic increase was intended to "allow the [cable] operator to adjust for inflation without being subject to city approval." House Re-

port at 25, *reprinted in* 1984 U.S.CODE CONG. & ADMIN.NEWS at 4662.[36] The FCC's rule is designed to account for increases in costs faced by the cable operator, such as "the price of programming ... and copyright fees." *Report and Order*, 50 Fed. Reg. at 18,655. It seems reasonable to believe that these increased costs will be due to inflation.

But regardless of whether the motivations underlying the two rules are identical, it is unquestionable that they serve the same purpose. Functionally, therefore, the FCC has simply removed the five-percent cap that Congress placed on automatic increases. Far from justifying its actions in light of a specific statutory provision covering the same subject, the Commission's only reference to section 623(e)(1) is to say that under the Commission's automatic pass-through provision "rate increases may be taken in addition to the 5% automatic annual increase to which most cable systems are entitled." *Id.*

In our view, the Commission's establishment of the automatic pass through was contrary to law. Indeed, counsel for the FCC conceded as much at oral argument. Congress had already addressed the question; it conferred no power upon—and left no room for—the FCC to weigh in with an automatic increase of its own. This act of gratuitous administrative largesse cannot stand.

### 3. *Signal Availability Standard*

Having decided to define "effective competition" for purposes of section 623(b) by reference to the number of "off-the-air" broadcast signals that were available in the cable community, *see* p. 1560 *supra*, the Commission was naturally required to determine how to measure when a signal should be considered "available." Accordingly, in the *Report and Order*, the FCC decided that

> a signal will be counted for purposes of effective competition if it places a pre-

---

**36.** We employ legislative history here not to contradict the clear words of the statute, as the FCC has sought to do, *see* pp. 1568–1569, *supra*, but to supplement our understanding of the concerns motivating Congress to include a particular provision. It cannot be gainsaid that ours is a far more traditional—and much more reasonable—use of legislative history.

dicted Grade B contour *over any portion* of the cable community or is significantly viewed within the cable community. *Report and Order,* 50 Fed.Reg. at 18,651 (emphasis added; footnote omitted).

Several parties, most notably an intervenor, the City of Dubuque, Iowa, attack this standard as arbitrary and capricious both in its use of the Grade B contour and "significantly viewed" measures, and in the precise manner in which the FCC has crafted the standard. We are constrained to conclude that the Commission has erred in fashioning the standard; inclusion of the language italicized above is arbitrary and capricious.

As noted earlier, *see* notes 8 & 9 *supra*, the measures of signal availability chosen by the Commission are highly imperfect— the fact that a particular house falls within the Grade B contour of a station does not mean that that station can in reality be picked up on a television set in that house. For example, the City of Winona, Minnesota complained to the Commission that the Grade B measure was particularly inaccurate when applied to it, because while the City

> is supposed to be receiving four Grade B signals … in reality, the City of Winona lies nestled in a valley surrounded by bluffs which rise to a height of 550 to 575 feet which significantly interfere with the ability to receive three of the four Grade B signals.

Joint Appendix ("J.A.") at 116. While practical difficulties such as these certainly should have been weighed in the balance by the FCC, they are not of great concern in and of themselves. The FCC properly considered ease of application in selecting its standard, *see* House Report at 66 ("FCC should establish objective nationwide criteria which are readily applicable"), *reprinted in* 1984 U.S. CODE CONG. & ADMIN.NEWS at 4703; *cf. Ashland Exploration, Inc. v. FERC,* 631 F.2d 817, 822 (D.C.Cir.1980) (agencies "may rationally turn to simplicity … and administrative convenience"), and the standard chosen by the agency bears a reasonable relationship to actual signal availability. *See Tele-Media Corp. v. FCC,*

697 F.2d 402, 404 n. 4 (D.C.Cir.1983) (referring to the Grade B contour as an indicator for "satisfactory off-the-air viewing"); *cf. Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 (D.C.Cir.) (agency must "demonstrate a 'rational connection between the facts found and the choice made'") (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Moreover, while the Commission candidly admits that its selected measures are only theoretical indictors and will lead to errors in practical application, *Report and Order,* 50 Fed.Reg. at 18,651, it cannot be gainsaid that *no* measure of signal availability is an error-free indicator of actual signal reception. *Cf.* FCC Brief at 17. Thus, use of the Grade B contour and "significantly viewed" measures is not in itself problematic, much less arbitrary and capricious; the problem lies in the manner in which the Commission has incorporated these measures into its signal availability standard.

Because the Commission knew it was dealing with the theoretical and appreciated the practical flaws inherent in its chosen measures, it was incumbent upon the FCC to craft the standard more carefully, to ensure that a signal is at least theoretically available over the entire cable community or at least some significant portion of the cable community. The failure to do so could predictably lead, under the FCC's current rules, to irrational results—that is, a cable system could be labeled as subject to effective competition due to the presence of three broadcast signals even though at no point within the cable community are all three signals even theoretically available.

The FCC's response to these admitted difficulties with its approach—which is, after all, central to the entire determination of whether effective competition exists—is essentially to throw up its hands. The Commission emphasizes the truism that no standard is perfect and that the agency has included a waiver provision to address problems such as those we have identified. *See* FCC Brief at 39. As discussed above, we accept the proposition that no reasonable measure of signal availability is fool-

proof. We also agree that, to a point, a waiver procedure is adequate to address inherent difficulties with whatever standard is chosen.[37] For example, a waiver proceeding would be appropriate to address a claim that while three Grade B contours theoretically covered the entire cable community, in reality only two off-the-air signals were available. What we cannot accept is the FCC's enormous margin of error created by its decision to "count" *every* signal that covers "*any* portion of the cable community." *Report and Order,* 50 Fed. Reg. at 18,651 (emphasis added). This remarkable standard is nowhere explained in the *Report and Order,* nor does the *Report and Order* reflect any awareness of the practical ramifications of this decision. What is more, the *Report and Order* fails to discuss why the "any portion" standard was selected over a more refined geographical qualification, such as "a significant portion of the cable community," or "over 75 percent of the cable community." This type of undifferentiated rulemaking is fundamentally flawed.[38]

Accordingly, we are persuaded that the FCC's signal availability standard is arbitrary and capricious; we therefore remand that issue to the agency for a reasoned explanation of its chosen standard or the development of a new standard.

## B. *Franchise Fees*

In accordance with our holding in *Yakima Valley Cablevision, Inc. v. FCC,* 794 F.2d 737 (D.C.Cir.1986), we have permitted Yakima and CCTA to intervene in this suit for the purpose of challenging the FCC's policy of "forbearance." In its *latest* formulation, that policy can be summarized as follows: The Commission *does* have jurisdiction to adjudicate disputes arising under the Cable Act's franchise fee provision, although its jurisdiction is concurrent with that of the courts. The Commission · will exercise its jurisdiction only where the dispute directly impinges on a national policy concerning cable communications and implicates the agency's expertise. *See Reconsideration,* 60 Rad.Reg.2d (P & F) at 518. Where the dispute concerns a matter of local taxation, the FCC generally will *not* assert its jurisdiction, because the dispute's relevance to a national communications policy will tend to be "slight" and the Commission's expertise will tend not to be implicated. *Id.* at 519. In these cases, the Commission will refer the dispute to "local courts," which are, in the Commission's judgment, better situated

---

**37.** Because *any* standard will lead to errors in application, we would expect that the Commission will make appropriately flexible use of its signal availability waiver procedures. In this regard, we note with concern the substantial barrier the current waiver system may place on franchising authorities. *See generally* Brief of Intervenor City of Dubuque, Iowa at 19; Reply Brief for Intervenor City of Dubuque, Iowa at 5–7. This is an area the Commission would be well-advised to deem fruitful for further study on remand.

**38.** While our discussion has focused on the Grade B prong of the Commission's signal availability test, and we have found the errors there more than sufficient to invalidate the standard as arbitrary and capricious, we note that there are also potential difficulties with the application of the "significantly viewed" prong. As we have discussed, *see* note 9 *supra,* the "significantly viewed" determination relies upon statistics reflecting the percentage of viewers in a community watching a particular channel. Dubuque complains that these "significantly viewed" statistics are collected on a county-by-county basis, a geographic designation that will not necessarily correlate with cable communi-

ties. For example, Dubuque indicates that it lies in the extreme eastern portion of its county and that the county is some thirty times the size of the city. Moreover, the relevant broadcast signals originate to the west of the county. Thus, Dubuque claims, the "significantly viewed" statistics for the county do not accurately reflect the percentage of viewers watching within the city, because a large portion of those watching may be located in the western portion of the county. These western viewers located outside the Dubuque cable community, the argument goes, severely skew the county-wide "significantly viewed" statistics, rendering those statistics incapable of providing meaningful information about "significantly viewed" stations within the Dubuque cable community. The FCC's response is essentially that the possibility of waiver cures any such problem. But waiver provisions cannot do service for reasoned decisionmaking. In any event, we need not resolve at this stage such potential flaws with the application of the "significantly viewed" prong, in light of our conclusions with respect to the Grade B prong.

to take evidence and delve into matters of local taxation. *Id.* at 518–19.

Reviewing its latest formulation, we are unable to conclude that the FCC's policy of forbearance is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). In contrast to several other provisions of the Cable Act,[39] the franchise fee provision does not contain an explicit delegation of regulatory authority. Because the provision establishes a *uniform federal standard* for franchise fees, and because the provision has been incorporated into the Communications Act, it is clear— as the FCC implicitly recognized in *Reconsideration*—that the *ultimate* responsibility for ensuring a "national policy" with respect to franchise fees lies with the federal agency responsible for administering the Communications Act. At the same time, however, the statute also appears to contemplate judicial enforcement of the franchise fee provision, as evidenced by the reference to "court action" in section 622(d), 47 U.S.C. § 542(d).[40] In the absence of more explicit guidance from Congress, the FCC necessarily enjoys discretion in setting its enforcement priorities and identifying those franchise fee disputes that require Commission action.

In the instant case, it cannot be said that the Commission abused its discretion. It was reasonable for the Commission to conclude that the typical franchise fee dispute does not directly impinge on a "national policy concerning cable communications." It was also reasonable for the Commission to conclude that its expertise does not extend to certain questions, such as whether a local tax is "unduly discriminatory" against cable operators and hence a "franchise fee" under the definition provided in the statute. *See* § 622(g)(2)(A), 47 U.S.C.

§ 542(g)(2)(A). We will not substitute our judgment on these matters for the Commission's judgment, absent evidence that the Commission acted irrationally or in contravention of the statute. Finding no such evidence in the Commission's final order, the Cable Act, or the legislative history, we affirm the Commission's policy as announced in *Reconsideration.*

Our affirmance of the Commission's policy, however, is based on our assessment that the Commission has *not totally abdicated its ultimate responsibility* for enforcing the franchise fee provision. *Cf. Adams v. Richardson,* 480 F.2d 1159, 1162 (D.C.Cir.1973) (en banc) (allegation that agency "consciously and expressly" adopted a "general policy" resulting in an abdication of its statutory duties). The Commission recognized in *Reconsideration* that one of the primary purposes of the Cable Act was to establish a "national policy" concerning cable communications, and that as part of this policy Congress chose to adopt a *federal standard* to govern the level of franchise fees. In recognition of these facts, the Commission reversed its course from its prior pronouncements suggesting total forbearance. First, it explicitly found that it *did* have jurisdiction over franchise fee disputes and *would* adjudicate such disputes where necessary to the achievement of congressional goals. Second, it implicitly acknowledged, we think, its responsibility to monitor judicial enforcement of the franchise fee provision and to assert its jurisdiction should inconsistent judicial interpretations threaten to undo the uniformity Congress sought to achieve in establishing a federal standard for franchise fees. With these marked shifts in policy, the Commission has made clear that it stands ready to enforce the

---

**39.** *See* note 4 *supra.*

**40.** Section 622(d) provides that "[i]n any court action under subsection (c), the franchising authority shall demonstrate that the rate structure reflects all costs of the franchise fees." This cross-reference to a "court action" arising under subsection (c) does not by its terms suggest that court actions are maintainable under *other* portions of § 622. It is possible to draw such an inference, however, from the fact that subsec-

tion (c) does not itself create an express cause of action. The cross-reference to a "court action" that is *not explicitly authorized* by the statute strongly suggests an assumption by Congress that courts would have jurisdiction to enforce § 622. Had Congress explicitly created a cause of action *only* under subsection (c), the inference would of course run in the opposite direction.

franchise fee provision where circumstances require Commission intervention. We are thus able to affirm the Commission's policy without fear that Congress' efforts to establish a federal standard for franchise fees will be thwarted.[41]

C. *FCC Interpretative Rules—Leased Access, Lock Box and Income Neutral Service* [42]

As part of the *Report and Order*, the FCC issued three rules here challenged by petitioners. The rules interpret the terms and conditions of leased access by third parties to cable operator systems ("leased access"), section 612, 47 U.S.C. § 532; an obligation to make available electronic boxes capable of blocking incoming channels in the home ("lock boxes"), section 624(d)(2)(A), 47 U.S.C. § 544(d)(2)(A); and a proviso that system installation not discriminate based on income ("income neutral service"), section 621(a)(3), 47 U.S.C. § 541(a)(3).

We hold the leased access rule unripe for review. A delay in adjudication would not impose a cognizable hardship under controlling precedent, nor is the rule fit for review. For reasons of judicial economy, we reach the merits of the remaining two rules and find that the agency arbitrarily excluded a subset of channels from lock box control. The service rule harmlessly restates the statutory obligation prohibiting discrimination on the basis of income.

1. *Leased Access*

a. Section 612

■ Section 612, 47 U.S.C. § 532 (leased access), is a lengthy provision designed "to assure that the widest possible diversity of information sources are made available to the public from cable systems in a manner consistent with growth and development of cable systems." 47 U.S.C. § 532(a). Operators of high capacity cable systems with thirty-six or more channels must designate from ten to fifteen percent of the channels for commercial use via leased access by "persons unaffiliated with the operator" (*i.e.,* third party programmers). 47 U.S.C. § 532(b). Commercial use "means the provision of video programming, whether or not for profit." 47 U.S.C. § 532(b)(5)(B). Subsection (c) states that "the cable operator shall establish, consistent with the pur-

---

**41.** As a final caveat, we observe that the FCC's policy of partial "forbearance" is predicated on the assumption that actions to enforce the franchise fee provision are maintainable in either federal or state courts. *See Reconsideration,* 60 Rad.Reg.2d (P & F) at 517–19; *see also* note 40 *supra.* The FCC's policy will be drawn into serious question if this assumption should prove erroneous.

**42.** The Administrative Procedure Act exempts "interpretative rules [also known as interpretive rules], general statements of policy, or rules of agency organization, procedure, or practice" from the procedural requirements of notice and comment rulemaking. 5 U.S.C. § 553(b)(1)(A) (1982). While the distinction between nonbinding interpretative rules and binding legislative rules in a given case can be "enshrouded in considerable smog," *Community Nutrition Institute v. Young,* 818 F.2d 943, 946 (D.C.Cir.1987) (internal citations omitted), it is at least generally understood that "an interpretative rule simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties," *General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1565 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985) (internal citation omitted), whereas legislative rules affect "the manner and circumstances in which the agency will exercise

its plenary power," *id.,* and impose "a presently binding norm," *Community Nutrition,* 816 F.2d 785, 789 at 947. *See also National Latino Media Coalition v. FCC* (D.C.Cir.1987) (distinguishing between interpretative and legislative rules).

We have no occasion to dispute the uniform assumption of the parties that all three rules are interpretative. By essentially incorporating the exhaustion doctrine, *see Office of Communication of the United Church of Christ v. FCC,* 779 F.2d 702, 706–07 (D.C.Cir.1985), section 405 of the Communications Act, 47 U.S.C. § 405, would seem to preclude invalidation of the challenged rules as legislative rules promulgated without notice and comment, as no party raised such a challenge before the agency. *Cf.* Brief for Petitioners ACLU, *et al.* at 4, 6 (referring to the rulings as "interpretive") ["Brief for ACLU"].

Furthermore, the classification of the provisions has no effect on our ruling. The leased access rule is unripe for review, whether or not interpretative. The lock box provision exceeds FCC statutory authority, even if independently defective for failure to abide by notice and comment rulemaking. The income neutral service provision, found to restate harmlessly the statutory obligation, precludes a finding that notice and comment rulemaking is required.

pose of this section, the price, terms, and conditions of such use which are at least sufficient to assure that such use will·not adversely affect the operation, financial condition, or market development of the cable system." 47 U.S.C. § 532(c). Aggrieved parties can go to district court for relief, 47 U.S.C. § 532(d), and to the Commission "upon a showing of prior adjudicated violations of this section." 47 U.S.C. § 532(e). Ultimately, the FCC is authorized to "promulgate any additional rules necessary to provide diversity of information sources," but only after high capacity cable systems (thirty-six or more channels) are available to seventy percent of U.S. households and subscribed to by seventy percent of the households to which such systems are available. 47 U.S.C. § 532(g).

#### b. The Interpretative Rule

Petitioners challenge the following FCC interpretation of section 612:

> We find no basis either in the legislative history or in the Cable Act that would require cable operators to afford mandatory access to control systems [such as computer systems and associated hardware] by third party commercial channel leasees. However, to the extent that a cable system deliberately configures itself technically to preclude commercial access, such action would likely be viewed as a direct attempt to thwart Congressional intent and could result in sanctions being imposed by a court of competent jurisdiction.

*Report and Order*, 50 Fed.Reg. at 18,642.

The *Report and Order* comment responded to the clarification sought by two cable operators (Western Communications, Inc. and Gill Industries) as to whether a channel leasee could demand access to the computer systems and associated hardware (the "control system") used by "addressable" cable systems.[43] The operators believed mandatory access to the control system would not be reasonable under section 612(c). By contrast, the ACLU alleges that

access to a control system is the "lifeblood" of third party programmers, particularly if they seek to offer pay-per-view television. Supplemental Brief·for ACLU· at 7; Brief for ACLU at 20–21.

In briefing the issue on the merits, the National Cable Television Association asserts that allowing access to the control system might also give access to confidential proprietary information, depending on the precise technical configuration of the system. *See* Brief for Intervenors National Cable Television Ass'n, *et al.* at 50–51. The ACLU responds that such advanced systems "surely" must be capable of a configuration protecting proprietary information. *See* Reply Brief for ACLU at 7.

For its part, the FCC, in its supplemental brief, emphasizes that the interpretative rule is "an extremely limited pronouncement that a cable operator is not required in every case to make its computer hardware and software available to a cable programmer, irrespective of the intrusion into the cable operator's proprietary information." Supplemental Brief for Respondents at 7. The FCC further notes that the ruling "appears to be limited to those systems which are addressable and which already have in place computer software that does not permit the cable operator to shield its proprietary information from potential third party users." Supplemental Brief for Respondents at 2–3. It is conceded that the FCC has not yet applied its interpretation in a particular case. Indeed, the FCC says that "it is unknown how many cable systems, if any, fall into this category." Supplemental Brief for Respondents at 3.

#### c. Ripeness

The ripeness determination is governed by the wellworn principles of *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and its companion cases, *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), and *Gardner v. Toilet*

---

**43.** According to the FCC, an addressable cable system is one in which "each converter/descrambler is normally controlled by a central computer which uses an integrated program

to authorize program choices, automatically generate billing information, and produce reports and accounts for the cable system." Supplemental Brief for Respondents at 2.

*Goods Ass'n, Inc.*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), which require courts "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515.

Review of the leased access rule satisfies the basic fitness requirement that a purely legal issue be framed. *See, e.g., Baltimore Gas & Electric Co. v. ICC*, 672 F.2d 146, 149 (D.C.Cir.1982) ("[T]he issue tendered is a purely legal one: whether the statute was properly construed by the [Commission].") (quoting *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515). In addition, the case satisfies a collateral fitness requirement that the action under review constitute final agency action. *Id.* ("Nor do we consider review excluded for lack of a final agency decision or simply because the order in question is 'interpretive.'" (citation omitted)).

But fitness for review is not satisfied when "judicial appraisal ... is likely to stand on a much surer footing in the context of a specific application of this [interpretative rule] than could be the case in the framework of the generalized challenge made here." *Toilet Goods Ass'n v. Gardner*, 387 U.S. at 164, 87 S.Ct. at 1524 (1967). Obviously, neither the parties nor the court can predict whether the technical configuration of a particular control system will successfully prevent access to proprietary information. Moreover, the extent of the burden, if any, imposed by the present rules can only be assessed in a specific context. Thus, pursuant to *Toilet Goods*, petitioners' challenge is not fully fit for review.

Petitioners' claim also fails the hardship test, which in its essence requires that the challenged action impose a non-speculative hardship on the parties if court consideration is delayed. *See id.* at 164, 87 S.Ct. at 1524.

Petitioners allege that the interpretative ruling affects cable operators and independent programmers in their day-to-day operations, thus meeting the hallmark test of hardship. In particular, they claim independent programmers will be forced to obtain access through more costly and less competitive means. *See* Supplemental Brief for ACLU at 8 ("The Commission's ruling thus places unaffiliated cable programmers at 'an acute competitive disadvantage'—precisely the type of injury that makes Petitioners' challenge ripe for review." (citation omitted)).

Although the Commission says this burden falls within the statute's contemplation, the argument is properly addressed on the merits. It does not undermine the potential hardship for purposes of ripeness. Nonetheless, resolution of the ripeness issue is not difficult. Interpretative rules as a general matter raise ripeness concerns, given that questions often arise as to the binding effect of the rule, the absence of immediate enforcement, and the need for further factual development. *See, e.g., Tennessee Gas Pipeline Co. v. FERC*, 736 F.2d 747, 751 (D.C.Cir.1984) ("Were we to entertain anticipatory challenges [to an interpretative rule change] pressed by parties facing no imminent threat of adverse agency action, no hard choice between compliance certain to be disadvantageous and a high probability of strong sanctions, *see Arkansas Power & Light Co. v. ICC*, 725 F.2d 716, 726 (D.C.Cir.1984), we would venture away from the domain of judicial review into a realm more accurately described as judicial preview."); *see also South Carolina Electric & Gas Co. v. ICC*, 734 F.2d 1541, 1545–46 (D.C.Cir.1984); *Baltimore Gas & Electric Co.*, 672 F.2d at 149.

Interpretative rules *yet to be applied* sharply intensify the difficulties generally besetting such challenges. The abstractness of the challenge is highlighted. The agency's willingness to enforce its apparent construction of the statute cannot be fixed. The present effect on the parties is necessarily speculative. *See, e.g., Middle South Energy, Inc. v. FERC*, 747 F.2d 763, 772 (D.C.Cir.1984), *cert. dismissed*, 473 U.S. 930, 106 S.Ct. 22, 87 L.Ed.2d 700 (1985) ("We accept the Commission's characterization of Order No. 303 as an interpretive rule that, of its own force, creates

no law and binds neither the public, the agency, nor the courts. It follows that if Order No. 303 had never been applied in a particular case it would be unreviewable." (citation omitted)). Most recently, this court, pursuant to the general principles of *Toilet Goods,* found unripe for review the yet-to-be-applied interpretative rule from the FCC that a lottery may be used to break a tie in a comparative license hearing. *National Latino Media Coalition v. FCC,* 816 F.2d 785 (D.C.Cir.1987). This reluctance to engage in premature review is also longstanding: "Only the strongest showing of the immediate and inescapable effect of the mere announcement of the [agency's] interpretation ... would suffice to advance review to the abstract stage at which it is now being sought." *National Ass'n of Insurance Agents, Inc. v. Board of Governors of the Fed. Reserve Sys.,* 489 F.2d 1268, 1271 (D.C.Cir.1974).

The challenge to the leased access rule does not pass muster under these guiding principles. We do not know who precisely will be affected. As noted by the FCC, "there has been no showing that any cable programmer has been denied access to any cable system as a result of the ruling, nor has it even been shown that any cable programmer has been dissuaded from seeking access because of the Commission's ruling." Supplemental Brief for Respondents at 5. We do not know if the FCC will follow the gloss it presents to the court in its brief. The classical justifications for pre-enforcement review are absent, *i.e.,* petitioners are not put to the test of compliance or exposure to lawsuit, *see, e.g., Tennessee Gas,* 736 F.2d at 751, nor is a specified activity *imposed* on a party, *id.* At this stage, the burden is more like that found to be minimal in *Toilet Goods,* 387 U.S. at 164, 87 S.Ct. at 1524 (1967) (agency action unripe when regulation insufficiently affects primary business conduct and no "irremediable adverse consequences flow from requiring a later challenge"). Furthermore, we are not foreclosing review, but instead forestalling judicial inquiry until the controversy can take on a better-defined focus. The Cable Act explicitly grants district courts the authority to de-

cide, on a case-by-case (and thereby fact-specific) basis, whether the "price, terms, and conditions" of commercial access are reasonable. *See* 47 U.S.C. § 532(d); *Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock,* 783 F.2d 237, 250–51 (D.C.Cir.1986) (choice between addressing the challenge in the present setting or permanently withholding review).

Petitioners cite to *American Fed'n of Gov't Employees v. FLRA,* 750 F.2d 143 (D.C.Cir.1984), for the proposition that agency action foreclosing a present statutory entitlement constitutes hardship in the proper circumstances. Supplemental Brief for ACLU at 6. The case is inapposite because no claimed statutory entitlement to leased access in a specific case has been "firmly and finally rejected" by the agency, nor has the rationale been applied "to a number of cases." *American Federation,* 750 F.2d at 145.

Also inapposite is *Independent Bankers Ass'n of America v. Smith,* 534 F.2d 921 (D.C.Cir.), *cert. denied,* 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976), where the court held ripe for review an interpretative ruling by the Comptroller of the Currency permitting national banks to install automated teller machines on thirty days' notice and "without reference to, or limitation by, state laws regulating or prohibiting branching by state-chartered banks." *Id.* at 926. Absent a ruling on the merits, state-chartered banks would have been immediately subject to "acute competitive disadvantage" pending the outcome of the litigation, *id.* at 929, the legal issues were "sharply defined," and the Comptroller had adopted "a definitive position ... not likely to change," *id.* at 930. As noted, the legal issue here cannot be fully defined absent specifics. More important, no similar imminent action is alleged, or can be inferred, to follow hard on the heels of the FCC's leased access rule.

In sum, this circuit has spoken directly to the issue of interpretative rules. Absent exigent circumstances, such as the impending proliferation of automated tellers in *Smith,* or special circumstances, such as an

adjudication presenting no threat whatsoever to the "basic rationale" of the ripeness doctrine, *i.e.*, "premature adjudication" or "judicial interference [with] an administrative decision," *Abbott Laboratories*, 387 U.S. at 148, 87 S.Ct. at 1515, we decline to consider the leased access rule ripe for review when it has yet to be applied.[44]

## 2. *Lock Box*

■ Section 624(d)(2)(A), 47 U.S.C. § 544(d)(2)(A), the lock box provision, states:

> In order to restrict the viewing of programming which is obscene or indecent, upon the request of a subscriber, a cable operator shall provide (by sale or lease) a device by which the subscriber can prohibit viewing of a particular cable service during periods selected by that subscriber.

In the *Report and Order*, the FCC opined in pertinent part that

> [w]e also believe that we should clarify the cable operators' responsibilities with respect to this provision. Thus, we believe that the cable operator must provide, upon subscriber request, by sale or lease, a lockbox for any channel over which it has editorial control. (*This would exclude commercial access, PEG [public, educational, and governmental] and must-carry channels*).

*Report and Order*, 50 Fed.Reg. at 18,655 (emphasis added).

The FCC makes only a faint-hearted attempt to justify the exclusion of select stations from lock box control. In its brief, it expressly declines to address the issue, relying exclusively on the explanation presented in the *Report and Order*. Brief for Respondents at 49 n. 36. Yet nowhere

in the *Report and Order* does the FCC support its conclusion that the lock box obligation applies only to those channels within the cable operator's editorial control. We are inclined to construe this record as an implicit concession by the agency that it cannot justify the exclusions. In any event, we find that the FCC exception has no discernible basis in the statute or the legislative history, and, therefore, we direct the FCC to delete the improper suggestion that lock boxes need not be capable of blocking selected channels.

## 3. *Income Neutral Service*

■ Section 621(a)(3), 47 U.S.C. § 541(a)(3), imposes a duty to avoid discriminatory access to cable service based on income:

> In awarding a franchise or franchises, a franchising authority shall assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides.

This language goes no further than to require that service not be denied to low income subscribers, a practice known as redlining. Nonetheless, the FCC initially interpreted this section in the Notice of Proposed Rulemaking to mean that "the franchising authority shall require that *all* areas of the franchised area be wired." *Notice of Proposed Rulemaking*, 49 Fed. Reg. at 48,769 (emphasis added). In the *Report and Order*, however, the FCC reversed field. Noting the complaints lodged by cable operators, it concluded that

> [T]he intent of [section 621(a)(3) ] was to prevent the exclusion of cable service based on income and that this section

**44.** We find the lock box and service rules to be ripe for review at this time because they meet this latter test. The FCC itself seeks a prompt adjudication on the merits, and hence there is no threat of untimely interference in agency decisionmaking, *see Abbott Laboratories*, 387 U.S. at 148, 87 S.Ct. at 1515, and petitioners' challenges to the rules "present[ ] purely legal questions, the understanding of which neither requires nor is facilitated by further factual development." *Better Gov't Ass'n v. Department of State*, 780 F.2d 86, 92 (D.C.Cir.1986). This is

in contrast to the petitioners' abstract challenge to the FCC's leased access rule, where the agency directly contests the ripeness of the action and the validity of the rule cannot be determined in advance of actual application. *See id.* at 95 (distinguishing *Webb v. HHS*, 696 F.2d 101 (D.C.Cir.1982), where the challenge to the agency rule was found to be "uniquely fact-based"). Considerations of judicial economy properly prevail in the present circumstances because we are dealing with prudential, not constitutional, aspects of the ripeness doctrine.

does not mandate that the franchising authority require the complete wiring of the franchise area in those circumstances where such an exclusion is not based on the income status of the residents of the unwired area.

*Report and Order*, 50 Fed.Reg. at 18,647.

A comparison of the *Report and Order* commentary with the statute reveals no significant variation. The FCC comment amounts to a legally insignificant prose restatement of the statutory obligation. Petitioners in essence do not contest this point, but challenge instead the reversal of the initial suggestion that section 621(a)(3) mandates universal service. The principal support for this argument is found in the following language from the House Report:

> In other words, cable systems will not be permitted to "redline" (the practice of denying service to lower income areas). Under this provision, a franchising authority in the franchising process shall require the wiring of all areas of the franchise area to avoid this type of practice.

House Report at 59, *reprinted in* 1984 U.S. Code Cong. & Ad.News at 4696.

We do not agree that the interpretative ruling conflicts with congressional intent. The statute on its face prohibits discrimination on the basis of income; it manifestly does not require universal service. The agency ruling explicitly reaffirms the prohibition against redlining emphasized by the House report. The ACLU argues that the committee report evidences congressional intent that as a practical matter one can only deal with redlining by wiring "all areas of the franchise." Otherwise "an endless variety of 'facially neutral' excuses [could] be used by cable operators to deny cable service to 'unprofitable' parts of a community." Brief for ACLU at 25. We hold that this one sentence from the committee report cannot reasonably be read to so drastically limit the agency's interpretation of the scope of its discretion in accomplishing the legislative goal. *See, e.g., FCC v. WNCN Listeners Guild,* 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d

521 (1981) ("The legislative history of the Act ... provides insufficient basis for invalidating the agency's construction of the Act."); *cf. supra* II.A.1. at 36–39. Rather, we read the sentence to require exactly what it says: "wiring of all areas of the franchise" *to prevent redlining.* However, if no redlining is in evidence, it is likewise clear that wiring within the franchise area can be limited. This is precisely the statement made in the interpretative ruling. It wholly conforms to the statute and the explication in the House report. We therefore uphold the comment as fully consistent with clear congressional intent.

## D. *Guam*

 Guam is an island thirty miles long, four to eight miles wide, that is located 9,000 miles from Washington, D.C. and 3,700 miles from Hawaii. The island's 100,000 inhabitants are served by two full-time television broadcast facilities, a microwave television station, six radio stations, and the Armed Forces station. It is also served by Guam Cable TV ("Guam Cable"), operator of a thirty-six channel cable system. Due to its distance from the mainland, Guam Cable videotapes over-the-air and satellite-delivered programming at a facility in Pasadena, California and flies the tapes daily to Guam. *See generally* Brief for Petitioner Guam Cable at 4–6.

Under the FCC's definition of "effective competition," 47 C.F.R. § 76.33(a)(2) (1986), Guam Cable will be subject to basic rate regulation because the island is served by fewer than three over-the-air broadcast signals. Guam Cable contends the island nonetheless is subject to effective competition and therefore should be exempted from rate regulation. *See* 47 U.S.C. § 543(b) (exempting cable systems subject to effective competition from rate regulation). In light of the unique conditions prevailing on the island, Guam Cable filed comments and reply comments requesting that the FCC promulgate an alternative definition of effective competition for cable systems operating in unique and isolated markets. J.A. at 335–52, 467–68. The FCC failed to respond to the comments.

Guam Cable appeals on the grounds that it was arbitrary and capricious for the FCC to ignore Guam's request for special treatment.[45] The FCC responds, in its brief, that it cannot be faulted as a legal matter for not responding to every one of the 140 comments and sixty-three reply comments received from various interested parties. Brief for Respondents at 49. Moreover, the FCC points out that Guam Cable is free to avail itself of the general waiver provision pursuant to section 76.7 of the Commission's rules, which states in pertinent part:

> (a) On petition by a cable television system operator, a franchising authority, an applicant, permittee, or licensee of a television broadcast, translator, or microwave relay station, or by any other interested person, the Commission may waive any provision of the rules relating to cable television systems, impose additional or different requirements, or issue a ruling on a complaint or disputed question.

47 C.F.R. § 76.7 (1986).

Notice and comment rulemaking procedures obligate the FCC to respond to all significant comments, for "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Alabama Power Co. v. Costle*, 636 F.2d 323, 384 (D.C.Cir.1979) (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C.Cir.1977)). In determining whether a particular issue is significant, this court has emphasized that "the 'arbitrary and capricious' standard of review must be kept in mind." *Home Box Office*, 567 F.2d at 35 n. 58. As applied to the present facts, the question before us is whether the FCC arbitrarily and capriciously ignored Guam's request for a special, uniquely tailored exception.

Significantly, Guam Cable sought relief *for Guam Cable alone*, not cable operators located in remote and isolated areas in general. J.A. at 335–52. Thus, although Guam Cable asked for relief in terms of modification of the definition of effective competition, J.A. at 350, it is beyond cavil that the nature of relief it sought was in substance a waiver, not a general rule. Pursuant to circuit precedent, this factor alone would make it extremely difficult to categorize the agency's failure to respond as "arbitrary and capricious." *Home Box Office*, 567 F.2d at 35 n. 58. ("Thus only comments which, if true, raise points relevant to the agency's decision *and which, if adopted, would require a change in an agency's proposed rule* cast doubt on the reasonableness of a position taken by the agency [that a comment is not significant]." (emphasis added)).

Added to this is the statutory obligation confronting the FCC to promulgate regulations within 180 days from enactment of the Cable Act, 47 U.S.C. § 543(b)(1), thereby obligating the agency—in less than half a year—to give notice of the rulemaking, absorb and respond to all significant issues raised in the 140 comments and sixty-three reply comments, and in fact issue regulations affecting the operation of cable television nationwide on every central issue, from rate regulation to the appropriate allocation of authority among federal, state and local regulators. Many agencies, it bears noting, have at times achieved far less in far longer time. In this context, the call for a special exception by Guam does not constitute an "arbitrary and capricious" failure to respond to a significant issue raised in the notice and comment process.

Finally, we note that the presence of the waiver provision insures that operators facing unique market circumstances such as Guam Cable have an available avenue of relief. Indeed, the FCC specifically committed itself to entertain a petition for

---

45. We note and reject Guam Cable's various formulations of its complaint, including the arguments that the Guam request obligated the FCC to respond pursuant to the requirement to "incorporate in the rules adopted a concise general statement of their basis and purpose," 5 U.S.C. § 553(c) (1982); and that the Commis-sion violated its own rule requiring it to "consider all relevant comments and material of record before taking final action in a rulemaking proceeding...." 47 C.F.R. § 1.425 (1986). The actual issue, which is addressed above, turns on whether the FCC discharged its obligation to respond to all significant comments.

waiver of rate regulation in the Guam market "[i]f and when Guam Cable can show that the general rules on rate regulation manifest an unfair hardship—it has yet to show that the regulated rates are inadequate...." Brief for Respondents at 49. The agency cannot rest on this defense because it nowhere cited the waiver in the *Report and Order.* Even if the agency's oversight reflected an excessive familiarity with its own rules, post hoc rationalizations cannot excuse the agency from its legal obligation to respond to all significant issues. *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983).

In an ideal world, the FCC ought to have responded to the relief earnestly put forward by Guam Cable. While we cannot accept the argument that a statutory provision exempting Guam from certain copyright laws mandates special treatment under the Cable Act, J.A. at 343, we underscore that the obligation to respond to significant comments represents the legally enforceable minimum. Given the incontestable power of agencies today, it would behoove them to exercise all reasonable energies to respond, even if briefly, to the comments of parties such as Guam, who in this case presents a potentially legitimate claim of exceptional circumstance. As a legal matter, however, given the precise setting of the rulemaking required and the special relief sought, we cannot say that the FCC violated its lawful obligation to respond to significant comments.

### III. CONCLUSION

For the reasons set forth above, the orders of the FCC are affirmed in part and reversed and remanded in part.

*So ordered.*

HARRY T. EDWARDS, Circuit Judge, concurring:

I concur in the opinion in Part II.C, but I wish to clarify the basis upon which we have resolved the issues posed. My principal concern with this section is that it may mistakenly be read to suggest that there is some general principle that interpretive rules yet to be applied are unripe for review. There is no circuit law to support such a suggestion, and we do not so hold in this case. It may be true that "[i]nterpretative rules as a general matter raise ripeness concerns," but there is no fixed principle that interpretive rules yet to be applied are not subject to judicial review. Indeed, if the parties challenging an agency's interpretive ruling have standing, and there is a case or controversy for Article III purposes, then there is a *presumption* of judicial review under the APA. *See* 5 U.S.C. §§ 702, 704 (1982).

Of course, this court may, as a *prudential* matter, defer its review of an agency's interpretive rule where institutional interests favor deferral and the petitioners are unable to demonstrate sufficient "hardship" to outweigh those interests. Recently, this court summarized the prudential aspects of the ripeness doctrine as follows:

[In its prudential aspects] ... the ripeness inquiry takes into account pragmatic concerns regarding "the institutional capacities of, and the relationship between, courts and agencies." These concerns include "the agency's interest in crystallizing its policy before that policy is subjected to judicial review," "the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting," and "the petitioner's interest in prompt consideration of allegedly unlawful agency action." In *Abbott Laboratories,* the Supreme Court announced the two-pronged test for ripeness that balances these interests. The test requires a court to evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."

Pursuant to the "fitness of the issues" prong, we first must decide whether the disputed claims raise purely legal questions and would, therefore, be presumptively suitable for judicial review. Second, we determine whether the court or the agency would benefit from the postponement of review until the agency action or policy in question has assumed

either a final or more concrete form. Finally, we examine the appellants' interest in immediate review. In order to outweigh any institutional interests in the deferral of review, appellants must demonstrate "hardship," *i.e.*, that "the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs."

*Better Gov't Ass'n v. Department of State,* 780 F.2d 86, 92 (D.C.Cir.1986) (footnotes omitted); *see also Eagle-Picher Indus. v. EPA,* 759 F.2d 905 (D.C.Cir.1985).

I agree that, under these principles, the leased access rule is not yet ripe for review, whereas the lock box and service rules are ripe. I write separately only to emphasize that we reach this result through application of these well-established ripeness principles.

STARR, Circuit Judge, dissenting in part:

I am in full agreement with my colleagues, save for one point. In my view, the Commission's recrafted definition of "basic cable service" enjoys sufficient warrant in the legislative history to pass muster, where, as here, the statute does not speak with absolute crystalline clarity. *See* Opinion at 1569 n. 34. That is to say, Congress has chosen, wisely or no, to speak to the precise issue at hand through a Committee Report that was expressly adopted by both Houses. *See id.* at n. 33. I would heed this Congressional voice and accordingly uphold the Commission's redefinition of "basic cable service."

Under more typical circumstances, where a mere Committee Report, lacking the authoritativeness of the House Report at issue here, was being pressed into service in an effort to override statutory language, I would be quick to agree with my colleagues' understandable refusal to permit that which is not law to triumph over that which was duly passed by Congress and signed into law by the President. We in the judiciary have become shamelessly profligate and unthinking in our use of legislative history, a regrettable fact of contemporary judicial life in the face of powerful voices of warning from the not-so-distant past, *United States v. Public Utilities Comm'n,* 345 U.S. 295, 319–21, 73 S.Ct. 706, 719–21, 97 L.Ed. 1020 (1953) (Jackson, J., concurring), as well as a growing number of voices in the present-day wilderness, *Burlington N.R.R. v. Oklahoma Tax Comm'n,* —— U.S. ——, 107 S.Ct. 1855, 1859–60, 95 L.Ed.2d 404 (1987); *Abourezk v. Reagan,* 785 F.2d 1043, 1054 n. 11 (D.C.Cir.1986); *Hirschey v. FERC,* 777 F.2d 1, 7–8 & n. 1 (D.C.Cir.1985) (Scalia, J., concurring).

But in this instance, I would defer to Congress' expression of intent in the relevant Committee Report under the unusual circumstances here, where the statute, as the majority candidly acknowledges, *see id.* at 1569 n. 34, admits of some ambiguity; where the Report speaks clearly on the precise question at issue; and where the Report was expressly considered and adopted by both Houses. Having so concluded, I nonetheless find myself in spiritual accord, as it were, with the reasoning and the result reached by my colleagues, and set down these few words of mildest dissent only with the greatest reluctance.